UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | DOCKET NO. 3:03 CR103 (JCH) |
| Plaintiff, | : | |
| VS. | : | |
| KURT C. CLAYWELL, | : | |
| Defendant. | : | JULY 7, 2005 |

### DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Kurt C. Claywell, respectfully submits this memorandum in anticipation of his sentencing on charges of tax and mail fraud, which currently is scheduled for July 11, 2005, at 3:00 p.m.

Mr. Claywell knows that his actions were wrong, and deeply regrets them. It is because of his sincere acceptance of responsibility that he not only pleaded guilty, but agreed not to challenge the Government's Sentencing Guidelines calculations (see Plea Agreement at page 4, ¶ 4).[1] It is also because of his acceptance of responsibility, and his desire to make amends both to his family and to the public, that Mr. Claywell offered his assistance in the various inquiries against Governor Rowland. The decision to provide that assistance came at a substantial cost: for months, Mr. Claywell was scrutinized in the media and pilloried by both the press and defenders of Governor Rowland, and his personal and professional life suffered drastically as a result.

---

[1] The Government has, however, agreed that Mr. Claywell may move this Court for a downward departure pursuant to U.S.S.G. § 5K2.0 on the grounds of his substantial assistance to local law enforcement in connection with the various inquiries involving former Governor Rowland.

The parties have agreed that Mr. Claywell's guideline range is 63-78 months before consideration of his motion for downward departure pursuant to U.S.S.G. § 5K2.0. Mr. Claywell recognizes that, while this Court is no longer bound by the United States Sentencing Guidelines, see United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the Court still is required to determine the applicable Guidelines range, and then to consider the list of factors set forth in 18 U.S.C. § 3553(a) before deciding what sentence to impose. See Crosby, 397 F.3d at 111-13. In making such a determination, this Court necessarily will be guided by the Sentencing Reform Act's dictate that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in Section 3553(a). Accordingly, Mr. Claywell submits this Sentencing Memorandum to provide the Court with information concerning his background and his conduct, both during the charged offenses and after; to set forth the basis for the requested downward departure pursuant to U.S.S.G. § 5K2.0; and to assess Mr. Claywell's appropriate sentence based on these factors as well as the provisions of the Sentencing Guidelines and § 3553(a).

## I. BACKGROUND INFORMATION

### A. *Procedural History*

Because this case has taken a fairly unusual (and lengthy) path in arriving at the upcoming sentencing, it is appropriate to recount for the benefit of the Court the procedural history of this matter.

Mr. Claywell's offices at 308 Hopmeadow Street were first raided by IRS agents in late August of 2001. Among other things, a great many documents -- both corporate and personal -- as

well as computer files were seized during that search.  Approximately 50 boxes of records were seized by the Government, most of which remain in the possession of the IRS today.[2]

In addition, many of the records seized by the Government were, or appeared to be, protected by the attorney-client or attorney work product privileges.  This fact required the Government to segregate and maintain the records with separate custodians, further complicating the task of Mr. Claywell's accountant.  Indeed, a number of personal records irrelevant to the investigation were seized and some, most notably the original pre-nuptial agreement between Mr. Claywell and his wife, were "lost in the shuffle" and only very recently located and returned by the Government.

For approximately a year after the search warrant was executed, the Government and IRS pursued this investigation by subpoenaing a tremendous number and variety of documents, and interviewing (we believe) a great many potential witnesses.

Beginning in approximately the late Fall of 2002, the parties began serious discussions about possibly resolving the case short of indictment.  Mr. Claywell was, from the beginning, prepared to plead guilty to the mail fraud charges in this matter, and was prepared to plead guilty to certain tax offenses.  However, the parties could not agree on the actual tax loss and fraud loss calculations.  Despite Mr. Claywell's willingness to have the parties' disagreements over the various loss calculations resolved by the Court at a sentencing hearing, the Government would not

---

[2] In part, this fact created significant logistical difficulties for the accountant Mr. Claywell retained to correct and amend the numerous tax returns that were required to be redone under the terms of his plea agreement.

enter into a plea agreement with Mr. Claywell unless he agreed to its determination of the relevant loss calculations.

As a result of this impasse, the Government ended the plea negotiations and obtained the indictment in this case on April 22, 2003. Consistent with the position he had taken with the Government since the outset of plea discussions, Mr. Claywell took the unusual course of appearing in Court on May 14, 2003, and -- without any plea agreement with the Government -- pleading guilty to Count 6 (charging him with subscribing to a false personal income tax return for the year 2000), and Counts 11 through 30 (charging him with mail fraud against the Travelers Insurance Company ("Travelers"). It was Mr. Claywell's hope at that time that the Government would relent on its refusal to permit the Court to resolve the parties' sentencing disagreements, or, alternatively, that if the remaining charges were tried to a jury, and if he were convicted on some or all of the remaining charges, then the Court would have the opportunity to resolve the disputed issues.

Thereafter, two factors came into play which led to the subsequent plea agreement and guilty plea by Mr. Claywell to Count One of the indictment. First, the Governor Rowland scandal and investigation began to gain momentum and it became apparent that Mr. Claywell's past dealings with the Governor could have a significant role in the various inquiries underway if he were to cooperate. Second, the parties continued their discussions about the loss calculations and ultimately determined that irrespective of the "actual" tax or other fraud losses caused by Mr. Claywell's conduct, they could (and did) reach agreement that the $550,000-$950,000 range was a reasonable approximation for the "intended" loss attributable to Mr. Claywell's conduct.

4

Accordingly, on September 8, 2003, Mr. Claywell returned to Court and changed his plea to guilty on Count One of the indictment (conspiracy to impede the IRS) pursuant to the terms of a written plea agreement with the Government. As discussed more fully below, Mr. Claywell began to cooperate with federal and state investigators soon thereafter. In addition, his accountant began the arduous task of reconstructing Mr. Claywell's business and personal financial condition for a five year period (1996-2000), which in fact required going back prior to 1996 to establish a firm starting point. In fact, the results of subsequent years (i.e., 2001-2003) for Mr. Claywell's business have also had an impact on the preparation of the amended corporate returns required by the plea agreement.

Finally, it bears noting that the delays in bringing this matter to Court for sentencing have been caused by a number of factors outside of Mr. Claywell's control. First, the Rowland investigation took on a life of its own and only reached closure earlier this year. Second, the reconstruction of Mr. Claywell's books and records required an enormous amount of time and effort on the part of his accountant. And, most recently, as a result of his pending divorce action Mr. Claywell's assets have been encumbered and it was very difficult for him to raise the funds with which to pay his accountant to complete the amended returns.

With this as backdrop, we turn to issues more directly significant for purposes of sentencing.

### B. *Personal and Professional Background.*

Mr. Claywell was born on April 5, 1952, the younger of two children. (Presentence Investigation Report ("PSR") ¶ 50.) Mr. Claywell's father, Karl, was an extraordinarily hard-

5

working man who started Claywell Electric Co., for which Mr. Claywell began working when he was only six years old. (PSR ¶¶ 50-51.) Indeed, by the time he was a teenager, Mr. Claywell was making service calls on his own for Claywell Electric. (PSR ¶ 51.) After striking out on his own and working for several other electrical companies, Mr. Claywell took over the business upon his father's retirement. (PSR ¶ 63.) In doing so, he had to confront a father who was less than confident in his ability to succeed and made no secret of his concern. According to a psychiatrist who has treated Mr. Claywell:

> [Karl Claywell] was full of critical comments, always gave lectures on family business that centered around sons who messed up the business they inherited from their father . . . .When Kurt took over the business, and it became prosperous, initially, his father thought it a fluke success. Kurt himself, in large part because of his father's constant criticism, always waited for failure. . . .
>
> In summary, Mr. Claywell grew up highly identified with his father, and his father's business ethics. Hard working to the point of being extraordinarily committed to his business he has been overzealous about achieving the success that would gain him the approval of the incorporated self-expectations he acquired by growing up with a terribly demanding and highly critical parent. . . .

(March 17, 2004 Letter of Dr. James Black.)

In 1977, when he was 25 years old, Mr. Claywell married for the first time, and had two children – Erin, who is now 23, and Kolin, who is now 20. (PSR ¶ 54.) Despite working long hours, Mr. Claywell had a good relationship with his children. (See Letter of Dr. Black.) After his marriage ended in 1992 after 15 years, Mr. Claywell subsequently married again. (PSR ¶¶ 54-55.) He had two children from this union – Olivia, now 7 years old, and Konner, who is 10. (PSR ¶ 55.) His treating psychiatrist notes that Mr. Claywell "cares greatly about his family and his children . . ." (See Letter of Dr. Black.)

6

Despite a relentless work schedule, Mr. Claywell has throughout his career found time to devote to charitable and volunteer efforts. As noted in the PSR at ¶ 53, Mr. Claywell "has donated money and helped raise money for several institutions including the University of Hartford, Cobb School Montessori, the Hill-Stead Museum, the Goodspeed Opera House, Village for Family and Children, and a Youth Hockey League. [He] coached Avon Youth Hockey for approximately five to seven years and retired after winning the state championship."

### C. The Mail Fraud Charges.

In the mid-1990s, Mr. Claywell was struck with a double tragedy when both of his parents were diagnosed with Alzheimer's disease. (PSR ¶ 52.) Mr. Claywell's mother died in 1997; his father lingered for many years, needing constant medical and nursing care, before dying in 2003. (See PSR ¶ 52.)

The ongoing medical care required by Mr. Claywell's father during the long years of his illness and decline led to the mail fraud charges to which Mr. Claywell has pleaded guilty. Beginning in 1997, as a result of his Alzheimer's dementia, Karl Claywell required home nursing care. Mr. Claywell previously had purchased a long-term care contract from Travelers that should have covered 100 percent of his father's nursing care costs. However, overwhelmed with a situation in which both of his parents were simultaneously declining, Mr. Claywell initially omitted to seek reimbursement for a significant portion of these expenses. In 1997, Mr. Claywell submitted claims for reimbursement totaling only approximately $6,500, despite having incurred approximately $12,000 in nursing expenses. In 1998, he submitted only $19,800 in claims, despite incurring approximately $31,200 in nursing expenses. In addition, Mr. Claywell never recovered

7

approximately $4,000 in reimbursable premium payments to which he was entitled. As of 1999, then, Mr. Claywell had approximately $20,000 in unsubmitted claims outstanding.

Beginning in 1999, Karl Claywell's physical condition deteriorated following a fall in which he broke his hip, and he was admitted to a nursing home for a three-month stay. While Travelers reimbursed Mr. Claywell for this stay, ConnectiCare also paid a portion of the bills, resulting in a $13,000 overpayment to Mr. Claywell by Travelers.

Following his father's discharge from the nursing home at the end of April 1999 and for the next 18 months, Mr. Claywell continued to submit monthly invoices to Traveler's for nursing home care, instead of submitting literally dozens of separate invoices for the home nursing care and adult day care services that Karl Claywell actually was receiving. Mr. Claywell foolishly thought that the two sets of payments would be roughly comparable, and that submitting a single monthly invoice would be simpler and more efficient. Indeed, although his actions were a terrible mistake, his "rough justice" calculation was not far off the mark: the Government apparently believes that the total amount of the discrepancy between the amount that Mr. Claywell actually received from Travelers over that 18-month period and the amount he should have received, including the $13,000 overpayment, is approximately $42,853.[3] When the $20,000 in outstanding benefit claims from 1997 and 1998 is factored in, as well as an additional $45,000 in unsubmitted reimbursements and other payments from Karl Claywell's care in 2002 and 2003, it is clear that

---

[3] The PSR states that the net loss to Travelers was "approximately $70,000." (See PSR ¶ 31.) However, in connection with the sentencing of Ms. Hill, the Government took the position that the loss amount was more likely in the vicinity of $42,853.

8

even the $42,853 figure significantly overstates any loss to Travelers and that in fact Travelers suffered no actual financial loss as a result of Mr. Claywell's improper conduct.

### D. The Tax Fraud Charges.

During the same time period, 1996 through 2000, Mr. Claywell also made serious errors with respect to his personal and professional tax obligations. Specifically, he made off-payroll payments to certain employees of Claywell Electric; paid certain personal expenses out of corporate funds; failed to pay appropriate corporate income taxes; and failed to pay taxes on his portion of profits from an offshore corporation that he had created.

According to the PSR, the tax loss sustained as a result of this conduct totaled $311,949.50 from the off-payroll payments, and $285,329.71 from the unreported personal income. Mr. Claywell stipulated to a loss amount of between $550,000 and $950,000, based on the assessment prepared by the Government that was available to him at the time he entered into his plea agreement. (See Stipulation attached to Plea Agreement and Attachment A thereto.) Since that time, however, consistent with his obligations under the plea agreement (see Plea Agreement at page 3, ¶ 2), Mr. Claywell has had amended tax returns prepared for both himself and Claywell Electric Co., Inc. These tax returns show actual loss amounts well below the amounts to which Mr. Claywell stipulated. With regard to the corporate tax loss figure, as set forth in the amended corporate returns, the actual tax loss according to Mr. Claywell's accountant is approximately $59,000, rather than $312,000. With regard to the personal tax loss figure, as set forth in the amended personal returns, the actual tax loss according to Mr. Claywell's accountant is either $84,000 (if married filing separately) or approximately $77,000 (if married filing jointly).

9

### E. Mr. Claywell's Assistance To Authorities.

Mr. Claywell pleaded guilty to the charges against him in May and September 2003. In early 2004, the Connecticut legislature began considering whether to initiate impeachment proceedings against Governor Rowland, who was then under federal criminal investigation for alleged bid-rigging and other improprieties. Mr. Claywell had relevant, personal knowledge concerning the actions of Governor Rowland and his associates. At a time when the impeachment committee and various investigative bodies were having a difficult time in obtaining witness cooperation, Mr. Claywell offered to and did meet on various and different occasions with representatives of the FBI, the IRS, and the Chief State's Attorney's Office. While the federal authorities ultimately determined that Mr. Claywell's cooperation was not sufficiently "substantial" to warrant the filing of a 5K motion in this case, the State authorities met with him and took an extensive sworn statement from Mr. Claywell, in which he detailed the nature and extent of his dealings with Governor Rowland and his staff. In addition, Mr. Claywell provided them with copies of correspondence with the Governor substantiating the gifts that had been provided. A letter from Chief State's Attorney Christopher L. Morano has been provided to the probation officer for inclusion with the PSR. At the time, Stamford Rep. Wayne Fox, the co-chair of the committee investigating Governor Rowland, expressed the view that Mr. Claywell's cooperation could "break the logjam" of previously reluctant witnesses. (See "Contractor Cooperating in Inquiry Committee's Investigation: Co-Chair Says Testimony Might Break Logjam," March 18, 2004, reported at http://www.nbc30.com/politics/2932837/detail.html.) (copy attached as Attachment A).

10

While Mr. Claywell ultimately did not offer testimony before the impeachment committee, his willingness to cooperate came at a significant personal cost. His offer to testify was heavily reported in dozens of articles in the media, usually accompanied by a recitation of his recent criminal plea and often by derogatory remarks by Governor Rowland's lawyers intended to impugn Mr. Claywell's credibility. Thus, Mr. Claywell's own legal troubles received an inordinate amount of press scrutiny, and his character came under repeated public attack, purely as a result of his decision to cooperate with authorities. Mr. Claywell's business suffered as a result, but his family suffered more. Indeed, Mr. Claywell's children were innocent victims, as the glare of publicity caused at least one of them to experience rejection and embarrassment at school.

### F. Recent Events.

In the last several months, Mr. Claywell has experienced additional difficulties both at home and at work. His marriage is ending, his business is crumbling, and he recently was arrested following the filing of a false and unsubstantiated allegation of assault made by a disgruntled employee. Truly, these are the worst of times for Mr. Claywell. As set forth below, however, we submit that both Mr. Claywell's conduct leading to the charges against him, and his actions since, support leniency on the part of this Court.

## II. ANALYSIS.

### A. Sentencing Guidelines Issues.

As set forth above, while this Court is no longer required to impose a Guidelines sentence, it must determine the applicable Guidelines range. See Crosby, 397 F.3d at 111-13. The parties stipulated to a total offense level of 25, including a three-level reduction for acceptance of

responsibility. As such, and pursuant to his plea agreement and the Government's subsequent assent, Mr. Claywell seeks a downward departure for his cooperation with and assistance to state law enforcement.

### B. Motion for Downward Departure Pursuant to U.S.S.G. § 5K2.0.

As set forth above, and as reflected in the letter of Chief State's Attorney Morano, Mr. Claywell cooperated with, and provided significant assistance to, the state and the legislature's impeachment committee during its investigation of Governor Rowland. Mr. Claywell provided documentary evidence and a sworn statement concerning his prior interactions with Governor Rowland, and was prepared to testify before the impeachment committee. In making himself available in this manner, Mr. Claywell endured a daily barrage of newspaper articles recounting his own criminal conviction and disseminating insinuations about his credibility and his motives. As recounted above, both he and his family have suffered greatly as a result.

Under Second Circuit law, the assistance offered by Mr. Claywell to state law enforcement is grounds for a downward departure under U.S.S.G. § 5K2.0. That section notes that "the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" Id. (citing 18 U.S.C. § 3553(b).) In United States v. Kaye, 140 F.3d 86 (2d Cir. 1998), the Second Circuit made clear its view that "assistance to local authorities" was precisely the kind of circumstance that would support a downward departure under U.S.S.G. § 5K2.0. Id. at 88-89. The Court in Kaye explicitly

12

reversed its prior holding that assistance to law enforcement is cognizable only under U.S.S.G. § 5K1.1, which requires a government motion.  Id.

Here, it is clear both that Mr. Claywell cooperated with state authorities, and that his assistance to the impeachment committee was a mitigating circumstance "not adequately taken into consideration by the Sentencing Commission."  See U.S.S.G. § 5K2.0.  As such, Mr. Claywell respectfully requests that this Court sentence him to a non-Guidelines sentence on the ground basis of his cooperation with the state authorities in the impeachment proceedings.

### C. Analysis Under § 3553(a).

In Crosby, the Second Circuit directed trial courts to consider not just the Guidelines-derived sentencing ranges, but the factors enumerated in 18 U.S.C. § 3553(a), in determining an appropriate sentence.  See Crosby, 397 F.3d at 111-13.  In this case, an analysis of the § 3553(a) factors further counsels in favor of leniency.

Section 3553(a) sets forth a number of factors that affect a sentencing disposition.  Chief among these are "the nature and circumstances of the offense and the history and characteristics of the defendant," and "the need for the sentence imposed . . . to reflect the seriousness of the offense . . ."  Id.  The statute directs Courts to impose a sentence "sufficient, but not greater than necessary," to accomplish its intended purpose.  Id.

We respectfully submit that an analysis of these factors suggests a lenient sentence. As set forth above, Mr. Claywell's actions were much more the product of his carelessness and his belief that the various financial shortcuts he took would all "come out in the wash," than the result of a desire either to harm others or to realize any financial benefit for himself.  While his offenses were

13

serious, they were less culpable than had he actually sought to enrich himself at the expense of others. Moreover, as set forth above, Mr. Claywell is a devoted father of four children who has regularly made substantial civic and charitable contributions to his community, both through monetary donations and through longstanding volunteer efforts. Particularly given how much Mr. Claywell already has suffered, both personally and professionally, imposition of a sentence including significant prison time would certainly be "greater than necessary" to serve either punitive or deterrent motives.

### D. The Court Should Not Impose A Fine Against Claywell.

Mr. Claywell acknowledges that he is subject to a restitution order pursuant to 18 U.S.C. § 3664. Given the existing and likely future decline in his business; the dissolution of his marriage; his mounting legal and accounting bills; and the prospect of incarceration that would disable him from earning a living, Mr. Claywell's ability to satisfy the restitution order will be taxed to the utmost. Accordingly, Mr. Claywell requests that this Court exercise the discretion vested in it under 18 U.S.C. § 3572(b) and decline to impose a fine against him.

## CONCLUSION

For the reasons set forth above, Mr. Claywell respectfully requests that this Court grant him a downward departure pursuant to U.S.S.G. § 5K2.0; that the Court impose a lenient sentence; and

that it decline to impose a fine.

                                                THE DEFENDANT
                                                KURT C. CLAYWELL

                                          By_____
                                                Stanley A. Twardy, Jr. (ct 05096)
                                                Day, Berry & Howard LLP
                                                One Canterbury Green
                                                Stamford, Connecticut 06901-2047
                                                (203) 977-7300

## CERTIFICATE OF SERVICE

       This is to certify that a copy of the foregoing was sent via email and/or facsimile, and first class mail to the following counsel on July 7, 2005:

William J. Nardini, Esq.  
Assistant U.S. Attorney  
157 Church Street, 23rd Floor  
New Haven, CT 06510

M. Hatcher Norris, Esq.  
Butler Norris & Gold  
254 Prospect Avenue  
Hartford, CT 06106-2041

Mr. Ray Lopez  
U.S. Probation Officer  
U.S. District Court  
915 Lafayette Boulevard  
Bridgeport, CT 06604

                                                                        _____  
                                                                        Stanley A. Twardy, Jr.