UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**FILED**

2005 AUG 10 ⊃ 2: 32

U.S. DISTRICT COURT
BRIDGEPORT, CONN

UNITED STATES OF AMERICA           :

v.                                 :

KURT C. CLAYWELL                   :

Case No. 3:03-CR-103 (SRU)

August 10, 2005

### SENTENCING MEMORANDUM

## I. Introduction

The Government submits this memorandum in anticipation of a sentencing hearing

scheduled for Friday, August 19, 2005, at 3:00 p.m.  The defendant in this case, Kurt Claywell, is

the owner of a major electrical contracting company in Connecticut.  Claywell became wealthy

by winning bids to do electrical work for many high-profile public works in recent years,

including projects at the ill-starred Connecticut Juvenile Training School, the Stamford

Courthouse, the Hartford Public Library, the University of Connecticut, and the federal

submarine base in Groton.  Despite this success, Claywell has not been satisfied with turning an

honest profit.  He was prosecuted federally in 2000 for pilfering over $400,000 from his

employees' pension funds to pay for his own personal expenses, and was sentenced to two years

of probation.  Apparently unchastened, Claywell continued to commit a whole series of tax and

fraud offenses, cheating his fellow taxpayers and an insurance company of hundreds of thousands

of dollars.  After an exhaustive joint investigation undertaken by the Internal Revenue Service,

the U.S. Postal Inspection Service, the Federal Bureau of Investigation, and the U.S. Department

of Labor, the defendant finally pled guilty to multiple charges in 2003.

Until approximately one month ago, the Government expected sentencing in this case to

be fairly uncontroversial.  The parties had negotiated a plea agreement with an unusually detailed

stipulation of the defendant's offense conduct. The plea agreement also sets forth a complete

guideline stipulation, and both parties agreed not to seek any upward or downward departures. In

the wake of the plea agreement, the Government agreed that the defendant's provision of

information to state authorities in connection with the inquiry into the misconduct of now-

disgraced former Governor John Rowland would permit this Court to consider whether, in its

discretion, to depart downward pursuant to Section 5K2.0 of the U.S. Sentencing Guidelines. In

short, there appeared to be no legal issues in dispute.

Then, last month, one business day before Claywell's sentencing was scheduled to occur

before the Hon. Janet C. Hall, Claywell submitted to the Government and the U.S. Probation

Office copies of amended personal tax returns -- returns which he presumably intends to file with

the IRS. As part of the plea agreement, Claywell had agreed to prepare and file corrected

personal income tax returns, corporate income tax returns, and corporate quarterly employment

tax returns. Among other things, the plea agreement identified over $1 million in funds that the

defendant had siphoned out of his corporation, by paying personal expenses, without reporting

them as taxable income to himself. The stipulation of offense conduct listed each of these

personal expenses in an attached spreadsheet, and the defendant specifically committed to

include those expenses as income on his amended returns:

> Each of these personal expenses was reportable as personal income to the
> defendant in the year in which the expense was paid. The defendant agrees to
> report each of these personal expenses, as well as any other reportable income, on
> amended personal income tax returns for himself for the period from 1996
> through 2000.

Plea Agreement at 9.

In a stroke of remarkable audacity, and in complete disregard of the plea agreement,

Claywell's amended personal income tax returns reflect *absolutely no additional income from these personal expenses paid out of corporate funds*. One searches in vain for the slightest mention of the $50,000 speedboat purchased with corporate funds; for the $33,578.78 spent on a birthday party; for the $27,592.97 spent on a jet-ski dock at his lake house; or for any of the other personal luxuries paid out of corporate funds. In fact, he reports income from his corporations that is *exactly the same* as contained on his concededly false tax returns. Only a careful examination of his corporation's amended returns discloses where these personal expenses have now been tucked away: into a nontaxable "loan to shareholders" account on the corporate books.

What is most surprising about Claywell's invocation of this accounting gimmick is that the Government had anticipated it during the investigation; had amassed compelling documentary evidence that negated it; and had obtained mutually corroborating information from cooperating witnesses that, far from considering these personal expenses to be "loans" to himself, the defendant knowingly chose to conceal them as deductible business expenses. As part of the plea negotiations, the Government insisted that it would only enter into a plea agreement and recommend that the defendant be granted points for accepting responsibility if he admitted this central aspect of his massive tax fraud: that he had cooked his corporate books precisely in order to avoid taxes on the lavish personal expenses that had been paid with corporate funds. Ultimately, Claywell conceded his criminal motive, and his concession was memorialized in the stipulation of offense conduct:

> The defendant was aware that a "loan to officers" account existed in his internal bookkeeping system, and in fact directed his employees to assign some personal expenses charged to corporate credit cards to that account on a monthly basis. He knowingly and willfully caused his employees to assign the vast majority of his personal expenses paid by the corporations to job codes and

3

general ledger categories other than the "loan to officers" account, *because he did not intend to reimburse the corporation for those expenses.*

Plea Agreement at 9 (emphasis added). Claywell has now flouted this agreement. He has brazenly presented the Government and this Court (through the Probation Office) with false income tax returns for, which deny the very heart of his tax conspiracy. He is thoroughly, even defiantly, unrepentant. Accordingly, this Court should deny him any credit for acceptance of responsibility.

As if that were not enough, the Government has now learned that Claywell has continued to engage in criminal conduct in the wake of his plea. Specifically, throughout 2004 Claywell falsely certified that he had paid federally mandated fringe benefits to electricians whom he employed on a federally funded project at the submarine base in Groton, Connecticut. Contrary to statements he made under oath on weekly certified payroll forms, Claywell did not make specified contributions to pension plans on behalf of certain listed employees. In certain cases, Claywell never even opened a pension account for the employees in question. And lest there be any doubt about the defendant's state of mind in making these misrepresentations, it need be pointed out only (a) that Claywell's first prosecution was for pension embezzlement; (b) that as part of Claywell's present prosecution he has acknowledged submitting false certified payrolls and failing to remit taxes withheld from checks issued to his employees as part of their prevailing wage payments; and (c) that Claywell has twice before been investigated and punished by the state and federal Departments of Labor for failing to pay his electricians their prevailing wages.

In short, Claywell refuses to change his criminal ways. Two years of probation from his first prosecution failed to rehabilitate him. The last two years on pre-sentencing supervision have

4

failed to deter him. The Government respectfully submits that a substantial term of incarceration is needed to prevent Claywell from continuing to cheat other businesses, his own employees, and his fellow taxpayers.

Because the Court has not had the benefit of participating in Claywell's two prior pleas, or the hearing in which Judge Hall found that he had violated the conditions of his release, or of hearings involving his four co-conspirators (Pamela Hill, Sara Taylor, Roger Bennett, and James Dempsey), the sentencing memo is a bit longer than usual. First, the Government sets forth the procedural history of this case. *See* Part II *infra*. The Government then describes in some detail the offense conduct, most of which is reflected in substantial part in the stipulation of offense conduct appended to the plea agreement. *See* Part III *infra*. It then responds to the defendant's contentions regarding the actual loss to Traveler's Insurance and the amount of restitution he owes. *See* Part IV.A *infra*. The memo then sets forth its reasons for agreeing that the Court has discretion to consider whether to depart downward pursuant to U.S.S.G. § 5K2.0 based on the defendant's cooperation with state authorities in the Rowland matter. *See* Part IV.B *infra*. Next, the Government explains why the Court should deny the defendant any credit for acceptance of responsibility. He has failed to file correct amended tax returns as required by the plea agreement and instead has submitted false returns to the Government and the Court, *see* Part IV.C.1 *infra*; he has engaged in continuing criminal activity, *see* Part IV.C.2 *infra*; and as Judge Hall found he has violated the conditions of his release, *see* Part IV.C.3 *infra*.

## II.  Procedural History

On August 28, 2001, federal authorities executed a search warrant at the Simsbury office of Claywell Electric, a company wholly owned by Kurt Claywell. The warrant principally called

for the seizure of records relating to tax offenses involving a shell corporation named Inter-Island

Holding & Development, Inc., which the defendant had incorporated in the Bahamas. While

executing this search, agents noticed other documents indicating that the defendant was engaged

in a much broader tax scheme, which included disguising personal expenses as deductible

business expenses. They also located and seized a handgun in the defendant's office safe.

Additional search warrants were later issued over the course of the investigation for the same

premises, in order to obtain further documents relating to tax and mail fraud charges.

Because the defendant was still on probation from an earlier federal prosecution, in which

he had pled guilty to embezzling over $400,000 from his employees' pension plan, an arrest

warrant was issued for the defendant based on the gun found in his safe. After an evidentiary

hearing, Judge Thompson found that the Government had not proven that the defendant had

knowingly possessed the firearm which was found in his office safe.

On April 22, 2003, a federal grand jury sitting in New Haven returned a 31-count

indictment against Claywell. Count 1 charges him with what is generally known in the Second

Circuit as a *Klein* conspiracy -- that is, a conspiracy to impair and impede the Internal Revenue

Service in its administration of federal tax law. *See generally United States v. Klein*, 247 F.2d

908 (2d Cir. 1957). Counts 2 through 10 charge him with filing false tax returns. Count 11

charges him with conspiracy to commit mail fraud in connection with a Traveler's Insurance

policy, and Counts 12-30 contain substantive mail fraud counts. Count 31 charges him with

being a felon in possession of a firearm. The defendant was presented and arraigned on April 28,

2003.

In May and June 2003, four cooperating witnesses entered guilty pleas to informations

6

charging them with misconduct in connection with the defendant's tax schemes. On May 6, 2003, Claywell's office assistant Sara Taylor pleaded guilty to a one-count information charging her with a tax misdemeanor. On May 13, 2003, Claywell's accountant Roger Bennett pleaded guilty to a one-count information charging him with *Klein* conspiracy. On May 16, 2003, Claywell's office manager Pamela Hill pleaded guilty to a one-count information charging her with *Klein* conspiracy. On June 30, 2003, Claywell's part-time bookkeeper James Dempsey pleaded guilty to a one-count information charging him with *Klein* conspiracy. (Taylor was sentenced on November 5, 2003, to one year of probation. Hill was sentenced on December 2, 2003 to two years of probation. Bennett and Dempsey are scheduled to be sentenced before Judge Hall on August 30 and 31, respectively.)

On May 14, 2003, the defendant changed his plea to "guilty" on Counts 6 (filing a false personal income tax return for the year 2000), and 11-30 (the mail fraud counts). He did so absent a plea agreement. As the Government indicated to Judge Hall during the plea proceeding, it intended to proceed to trial on the remaining counts. The Government further alerted the Court that it intended to argue at any sentencing that the defendant should be denied credit for acceptance of responsibility, because he had refused to admit to any of the central allegations of the tax conspiracy contained in the indictment.

In this respect, the defendant's sentencing memorandum tactfully understates the gulf that separated the parties at this point. At stake was more than just the "actual tax loss and fraud loss calculations," Def. Sent. Mem. at 3, to the extent that such a phrase suggests a mere quantitative dispute. The defendant was refusing to acknowledge the very notion that he had acted criminally with respect to most of his tax fraud scheme. For example, his negotiating position was that all

7

of his personal expenses paid out of corporate funds (and unreported on his income tax) were really just nontaxable loans from the corporations that he had always meant to repay. As discussed in more detail below, such a contention flew in the face of abundant evidence that the defendant had studiously avoided logging these expenditures in his corporate "loan" accounts, and instead buried them in job-related ledger categories to evade taxes.

On September 8, 2003, the defendant appeared at a second plea hearing, this time pleading guilty to Count 1, which charged him with the overarching tax conspiracy. This time, there was a detailed plea agreement. The defense correctly pointed out two of the factors that seem to have induced the defendant to concede his guilt at this point. First, the parties agreed to stipulate to the tax loss for guidelines purposes, while not specifying the precise amount of taxes that Claywell would have to pay for purposes of restitution. Second, the defendant sought to provide information in connection with the investigation of then-Governor Rowland. *See* Def. Sent. Mem. at 12-13. The defendant neglects to mention a third event: On August 15, 2003, the Government notified him that it had learned of yet more criminal wrongdoing on his part, in connection with his submission of a fraudulently altered investment account statement to Webster Bank in connection with a loan application for more than $400,000. Claywell had doctored the account statement to make it falsely appear that an investment fund worth $569,558.21 held by the Inter-Island shell corporation was in fact in his own name individually. *See* PSR ¶30. Within a month of this disclosure, the defendant entered the plea agreement.

The plea agreement contained a complete guidelines stipulation, based in part on an aggregate tax and fraud loss between $550,000 and $950,000. The parties also agreed that the defendant should receive enhancements for failure to report income derived from criminal

8

activity, § 2T1.1(b)(1), for sophisticated concealment, U.S.S.G. § 2T1.1(b)(2), for leadership

role, U.S.S.G. § 3B1.1, and for obstruction of justice, U.S.S.G. § 3C1.1. Despite the admonition

of the Guidelines Manual that a defendant should not generally receive credit for acceptance of

responsibility where he engages in obstructive conduct during the investigation of the instant

offense, the Government agreed that this was a sufficiently unusual case that it would

recommend a three-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.

This yielded a total offense level of 25 and a Criminal History Category II. The parties agreed

that neither would seek a downward or upward departure. The parties recognized that the Court

was not bound by the plea agreement's guidelines calculation. Plea Agreement at 3-4.

The Government's agreement to recommend acceptance of responsibility was expressly

conditioned upon, *inter alia*, (1) the defendant's refraining from criminal conduct, and (2) his not

violating any condition of release. Plea Agreement at 3. The plea agreement also contained a

five-page, single-spaced stipulation of offense conduct which the defendant personally signed,

and which he likewise affirmed under oath during his plea colloquy. As a condition of the

agreement, the defendant agreed to file corrected personal income tax returns, corporate income

tax returns, and quarterly corporate employment tax returns for the years 1996 through 2000 by

the time of sentencing. Plea Agreement at 3.

The defendant's sentencing hearing was continued numerous times on consent of the

parties, first to determine whether he would be able to provide assistance to federal and state

authorities in connection with the investigation of now former Governor Rowland, and later to

allow him additional time to prepare and file amended tax returns as required by the plea

agreement.

9

On June 13, 2005, the Hon. Janet C. Hall held a bond violation hearing at the request of the U.S. Probation Office. At that hearing, the Court found that the defendant had violated the conditions of his release. In particular, the Court found that the defendant had failed to notify the Probation Office that he had been questioned by police on several occasions; twice in connection with state charges that he had sexually assaulted a female employee, once in connection with a domestic disturbance at his residence in Simsbury; and once when caught speeding. Only when he was eventually arrested by Simsbury police in connection with the sexual-assault charges did the defendant's counsel notify the Probation Office. The Court continued sentencing on the violation, and in the interim set more stringent reporting conditions. At this point, the Government indicated that it would object to any further continuances because the defendant had still failed to produce any amended tax returns despite the lapse of 22 months since his second guilty plea. Judge Hall indicated that no further extensions would be granted, and that any failure to file amended returns would be a factor to be considered by the Court in determining whether he had accepted responsibility for his offense.

On July 13, 2005, the case was transferred to the Hon. Stefan R. Underhill for all further proceedings.

Sentencing is presently scheduled for August 19, 2005, at 3:00 p.m.

## III. **The Offense Conduct**

### A. **Tax Evasion**

**1. Employment Tax**. Claywell, with the help of others, filed false employment tax returns, and evaded employment tax, in a number of respects: (a) paying off-payroll wages to employees, (b) failing to remit tax withholdings to the IRS, (c) submitting false quarterly

employment tax returns to the IRS, falsely claiming that "wages" were paid to his elderly father
and others, and (d) producing false documents in 1998 to an IRS Revenue Agent engaged in an
employment tax audit.

*Off-Payroll Wages.* Many employees were paid outside the payroll account, so that
significant employment taxes were not withheld or remitted to the Government. Kurt Claywell
gave certain employees the option of working under the table – that is, of receiving their pay by
checks without withholding taxes. Additionally, Claywell often omitted bonus payments from
W-2s for employees who were otherwise on the payroll. Another employee was paid partially
under the table, so that his reported income would not disqualify him for Social Security benefits.
Other employees received payments that were designated "travel reimbursements." This was
often a fiction designed to mask bonus payments to employees so as to avoid reporting taxable
income. Claywell's personnel and payroll records contain no evidence that employees filed
receipts or other claims for travel.

Attached to the stipulation in the plea agreement was a chart which, the parties agreed,
"identif[ies] many payments to employees from which the defendant should have withheld
employment taxes, but failed to do so." Plea Agreement at 8.   As the chart indicates, Claywell
failed to report $738,750.76 in wages paid out of Claywell Inc. and Claywell Electric from
March 1996 through December 2000, resulting in omitted taxes of $311,949.50.[1]

*Unremitted Withholdings.* Some employees were paid a portion of their "prevailing
wages" benefits by check, from which employment taxes were deducted but not remitted to the

---

[1]The third column of Attachment A to the plea agreement is erroneously captioned
"omitted income" rather than "omitted tax."

11

IRS. These amounts were often never included in the quarterly employment tax returns of
Claywell's companies, and hence never remitted to the IRS.

*False Quarterly Employment Tax Returns*. On a regular basis, the defendant directed
his employees to falsely add his elderly father and others to the corporate payroll as having
worked on a particular job in a given week, even though they had not performed such work. He
did so in order to circumvent Connecticut state labor laws requiring that apprentice electricians
be supervised by journeyman electricians on a 1:1 ratio. Claywell sometimes had trouble
retaining experienced electricians, and so he often failed to satisfy the requisite ratio at a given
job in a given week. His employees had standing orders that whenever a job was "out of ratio,"
they should insert his father (a licensed journeyman electrician) or others into the certified
payrolls to be submitted on a weekly basis to the state Department of Labor (either directly or
through the prime contractor). Beginning in late 2000, Kurt Claywell instructed his bookkeepers
no longer to use his elderly father as a filler, but instead to use his teenage son, who held no
electrician's license. On the certified payrolls sent to the state, however, the name showed up
simply as "K. Claywell" at his father's address. For the periods that the son was listed as
working as a journeyman, he was in fact attending school out of state. Each of the certified
payroll forms contained a warning that the knowing submission of false information was a Class
D felony under state law. The defendant nevertheless either signed each of these certified payroll
forms, or directed one of his employees to sign such forms, despite his knowledge (1) that the
forms contained materially false information, and (2) that the submission of such false forms was
a criminal act under Connecticut law.

In order to falsify the certified payrolls sent to the state, Claywell's employees had to cut

12

checks to the "filler" journeymen from the payroll accounts. Checks cut to the defendant's father and son were controlled by the defendant himself. These paychecks had taxes withheld, and these payments were then falsely reported as "wages" in Claywell's quarterly employment tax returns (Forms 941). These 941s formed the basis for these employees' W-2s, which in turn resulted in falsely inflating Claywell Electric's business expenses which were eligible as deductions for purposes of corporate income tax.

    ***False Documents to IRS Auditor.*** In May 1998, IRS Revenue Agent James Curley began an employment tax audit of Claywell Electric. Roger Bennett was Kurt Claywell's CPA, and had Power of Attorney for Claywell for this audit.

    Curley began by examining a printout of subcontractor expenses for 1995, to determine whether any should have been designated employee wages (and thus should have had employment taxes withheld). Upon examining the 1995 list, Curley asked for backup documentation for certain payments. According to cooperating witnesses Bennett and bookkeeper James Dempsey, Claywell decided to create false documents in response to this initial request: (1) altered invoices that made personal expenses appear to be business expenses (so the auditor would not begin an income tax audit), and (2) a forged statement from one employee claiming to be a subcontractor and stating that he had reported all payments on his personal income tax. Cooperating witness Pamela Hill prepared false expense mileage logs as supporting documentation for this audit, at Claywell's direction.

    After Curley assessed some back withholding & penalties on a handful of employees he identified from the 1995 printout, he asked for similar listings of the subcontractor payments in 1996 and 1997. According to Bennett and Dempsey, Claywell directed them to create falsified

13

printouts for those two years, which omitted all entries for the employees Curley had caught in

1995. Bennett was directed to analyze the real printouts, and identified the entries to be deleted.

Dempsey used Microsoft Excel to create a spreadsheet template that looked like an exact replica

of a printout from Claywell's corporate accounting software. Claywell approved the final

falsified report. Bennett gave the false reports to the auditor on September 2, 1998. Deceived by

the fake reports, the IRS auditor concluded that no further taxes were due.

Had the auditor been provided with accurate information rather than the falsified

documents for 1996 and 1997, he would have assessed approximately $10,000 in back taxes.

### 2. **Personal Income Tax.**

*Personal expenses paid by corporate funds.*  For years, Claywell paid enormous personal

expenses out of corporate funds, without declaring these payments as personal income on his

1040s. For example, Claywell used corporate funds to build two houses and to renovate a

luxurious lake house; he bought a $50,000 speed boat, jet skis, and snowmobiles; he threw a

$50,000 birthday party for his wife; and he paid his children's private school tuition.

Claywell directed his employees to alter his business records to hide the personal nature

of these expenses. The names of payees were often truncated, for example by making checks

payable to "Cobb" rather than "The Cobb School." On some occasions, additional information

that might reveal an expense's personal nature was added to a check with a typewriter, after the

check had been generated by computer. For example, the computer will show a payment to

"Cobb," but the word "School" appears in another typeface on the check itself.

Claywell also directed employees to alter invoices, for example by whiting out the

addresses to which items were delivered. For example, he bought new kitchen appliances for his

14

home with corporate funds (logging them as business expenses), but the invoices retained in his records had the home delivery address whited out. He also had employees manufacture new false invoices–for example, his file on the $50,000 speed boat purchased from "Moore Marine Marketing" contains the real invoices for periodic payments towards his boat, and parallel forged invoices from "Moore Marketing" for the same payments, purporting to be for generators for the Stamford Courthouse.

Furthermore, Claywell directed his employees to assign personal expenses to particular jobs on which the company was working. For example, thousands of dollars used to pay for his wife's birthday party were assigned to the Connecticut Juvenile Training Center. One payment towards his father's nursing home was assigned to the Stamford Courthouse.

Claywell's corporations maintained a "loan to officers" ledger account. This "loan" account carried a relatively low balance, mostly accruing from miscellaneous charges from his monthly credit card bills. Claywell would direct an employee, often Sara Taylor, to assign each credit card expense to a particular category -- often to a particular job, and less often to the loan account as a personal expenses. In many cases, Taylor was falsely directed to record certain personal expenses on these monthly credit card logs as work expenses, coded to a particular state-funded job. Thus, Claywell was well aware of the existence of his "loan to officers" account, yet he regularly instructed his employees to assign his personal expenses to job-related accounting categories rather than as officer compensation or to the "loan" account.

The defendant never alerted his bookkeepers or accountants (who prepared his tax returns) to the fact that he had directed his employees to pay significant personal expenses out of corporate funds, while logging them as job-related expenses. Nor did he inform them that such

15

personal expenses needed to be re-assigned as "officer compensation" or as a "loan to officer." Thus, when bookkeeper James Dempsey prepared the annual trial balances for Claywell's corporations, he included an entry for the "loan" account that did not include the vast majority of Claywell's personal expenses paid out of corporate funds. Dempsey then passed this information to Claywell's CPAs who prepared his corporate and personal tax returns. Accordingly, none of these personal expenses were included as income of any sort on Claywell's personal income tax returns in tax years 1996-2000.

As part of his plea agreement, the parties stipulated as follows with respect to the loan account:

> The defendant was aware that a "loan to officers" account existed in his internal bookkeeping system, and in fact directed his employees to assign some personal expenses charged to corporate credit cards to that account on a monthly basis. He knowingly and willfully caused his employees to assign the vast majority of his personal expenses paid by the corporations to job codes and general ledger categories other than the "loan to officers" account, *because he did not intend to reimburse the corporation for those expenses.*

Plea Agreement at 9 (emphasis added). A chart of such unreported expenses is appended to the plea agreement as Attachment B. The items listed on these charts -- each of which was painstakingly identified by the Government as a personal expense after the service of dozens of grand jury subpoenas and numerous witness interviews -- total $1,019,259.77 in personal expenses from 1996 through 2000. They include payments ranging from $12,396.45 in gourmet groceries at "Labonne's Epicure Market," to $4,081 at "Moosavi Persian Rugs," to $52,156.70 for a speedboat from "Moore Marine Marketing," to $27,592.97 for a "jet dock" at "New England Jet Dock, Inc.," to $37,260 to "Valley Landscaping and Tree Service."

***Inter-Island Holding & Development, Inc.*** In 1993, Claywell created a corporation

16

chartered in the Bahamas called Inter-Island Holding & Development, Inc. In 1994, Claywell

began opening accounts in the name of Inter-Island at Fidelity Investments. He soon opened an

account at Fidelity in the name of a "Profit-Sharing Plan" ("PSP") for Inter-Island–that is, a

retirement plan where investments would grow tax-free, much like a 401(k) or an IRA. Fidelity

never reported any income to the IRS, relying upon Claywell's representation that the funds were

for a pension plan.

In fact, Inter-Island was not a functioning corporation. Instead, Claywell transferred his

elderly father's savings into the accounts (including an IRA and numerous savings bonds). At

certain points, Claywell then deposited the sale proceeds for his home (exceeding $1.5 million)

and at least two items that represent diverted corporate receipts. Claywell sometimes paid

personal expenses out of Inter-Island's assets, including a portion of his attorney fees for his prior

federal prosecution.

Most deposits to Inter-Island accounts took place by the defendant's cashing checks at a

local bank (Webster or Fleet), obtaining cashier's checks payable to Fidelity, and then sending

those cashier's checks to Fidelity. At least one of the checks fraudulently obtained from

Travelers Insurance was deposited in this manner to an Inter-Island account at Fidelity.

The defendant never filed any federal income tax return for Inter-Island, or the Inter-

Island PSP. Nor did Claywell ever include any income derived from the Inter-Island accounts on

his personal income tax returns.

The following is a summary of transactions occurring in the Inter-Island accounts, none

of which were reported on tax returns filed with the IRS by Claywell.

17

| | INCOME | | STOCK SALES | |
| :---: | :---: | :---: | :---: | :---: |
| **Year** | **Brokerage** | **PSP** | **Brokerage** | **PSP** |
| 1995 | $4,531.57 | $13,210.32 | $96,850.20 | $48,709.50 |
| 1996 | $1,480.12 | $18,066.71 | - | $1,588,716.72 |
| 1997 | $40.38 | $33,040.66 | - | $76,000.00 |
| 1998 | $39.81 | $33,080.42 | - | $29,538.06 |
| 1999 | $16.49 | $36,109.11 | - | - |
| 2000 | $25,946.77 | $26,096.28 | - | $250,746.90 |
| **TOTAL** | **$32,055.14** | **$159,603.50** | **$96,850.20** | **$1,993,711.18** |

On December 31, 2000, the Inter-Island Brokerage Account had a market value of

$1,667,523.57, and the Inter-Island PSP Account had a market value of $894,112.19. These

totals include investments, income, capital gains and/or capital appreciation.

As part of the plea agreement, the parties stipulated to the following:

> The defendant knowingly and willfully failed to file any tax return for
> Inter-Island, or the Inter-Island Profit-Sharing Plan. The defendant knowingly and
> willfully failed to report any income derived from the Inter-Island accounts on the
> personal income tax returns of himself or his close family member, or on any
> corporate income tax returns.

Plea Agreement at 10.

*Inflation of house basis.* As set forth in the plea agreement, the defendant falsely

inflated the cost basis for his home at 605 Deercliff in Simsbury, Connecticut, upon its sale in

2000, so that he could falsely take advantage of the exclusion for capital gains upon the sale of a

residence. Plea Agreement at 10.

### 3. **Corporate Income Tax**

*Deduction of Personal Expenses.* As part of his plea agreement, the defendant admitted that he "knowingly and willfully claimed personal expenses paid out of corporate funds as deductible corporate business expenses on the corporate income tax returns of Claywell Electric Co. and Claywell Inc." Plea Agreement at 10.

*Diversion of Corporate Receipts.* As part of his plea agreement, the defendant agreed that he "knowingly and willfully failed to report certain items that would constitute income to Claywell Electric Co. on its corporate income tax returns." Plea Agreement at 10. For example, after Claywell terminated a car leased in his corporation's name, the dealership issued Claywell a check for approximately $10,000. Rather than depositing the check in a corporate account and reporting it as income, Claywell instead deposited the check into one of the accounts in the name of the bogus Inter-Island shell corporation, and failed to report it on his tax returns.

*Manipulation of Work-in-progress reports.* As set forth in the plea agreement, the corporate income tax returns of Claywell Electric Co. are calculated according to the completed-contracts method of accounting. According to this method, the corporation realizes income and expenses relating to a particular contract for tax purposes only in the year in which work for that contract is substantially completed. From 1997 through 2001, the defendant directed his bookkeeper and accountant to alter the Work-in-Progress reports of Claywell Electric Co., in order to minimize the amount of income that would be recognized for tax purposes in any given year. The defendant and his co-conspirators altered records to make completed jobs appear to be still open, so that income attributable to those jobs would not be realized in a timely manner. Additionally, the defendant and his co-conspirators altered records to shift costs into more

profitable contracts that were closing, and to shift costs out of less profitable jobs that were

closing, so that the corporation would ultimately report less income on its corporate income tax

returns.

### B. **Mail fraud**

Kurt Claywell submitted fake invoices to Travelers Insurance under a long-term health-

insurance policy, claiming that his elderly (now deceased) father was living at the McLean

nursing home in Simsbury from January 29, 1999, through the date of the indictment. Claywell

told the insurance company that he had already paid the nursing home bills, and that the insurer

should mail the reimbursement checks directly to him. The insurance company regularly paid

these bills, at about $8000 per month, for a total of $150,750. Claywell had these checks

deposited to various accounts, including personal accounts in the name of his father but

controlled by Claywell, and which Claywell often used to pay personal expenses such as his

children's tuition bills. Some checks were immediately negotiated for cashier's checks and sent

to Fidelity investment accounts in the name of Inter-Island Holding and Development, which

were also controlled by Claywell.

In reality, however, the defendant's father had checked out of McLean's three months

after his admission in January 1999. From April 20, 1999, through October 30, 2000, he was

mostly living at home at 595 Deercliff Road in Simsbury -- right next door to the defendant.

During this period, the defendant's father spent most days at an adult day care center, which

usually charged less than $1000 per month, and he sometimes had visiting health aides. The

nursing home invoices sent to the insurance company were fakes. Claywell directed his

employees (including office manager Pamela Hill) to doctor old McLean invoices obtained when

20

his father had previously stayed at the nursing home. Claywell instructed them to white out the dates, type in a new date for each month's fraudulent invoice, and to mail them out on a regular basis. He even instructed them to insert the occasional claim for a $8 haircut, to make the invoices look realistic.

Even after Claywell's father was re-admitted to McLean nursing home on October 30, 2000, Claywell continued to take steps to conceal his fraud. The real bills that were newly generated by McLean showed an accurate re-admission date of 10/30/00. Claywell directed his assistant, Sara Taylor, to white out this date to avoid raising suspicions at Travelers, which had continuously received fake invoices showing an admission date of 1/29/99.

### C. Possession of a Firearm by a Convicted Felon

During a search of the Claywell Electric premises on August 28, 2001, IRS SA Thomas Mulligan found a loaded 9 mm pistol and a box of ammunition in a safe in a closet adjoining Kurt Claywell's personal office. According to Mulligan, Claywell stated "I don't know anything about a gun in the safe." Fingerprint analysis revealed Claywell's prints on the box of ammunition. The gun was stored, handle out, in a cubbyhole behind a small wooden door inside the safe. The gun was plainly visible once the wooden door was opened. Also behind the door was a small drawer which lacked a handle, in which SA Mulligan found a pack of Mobil credit cards that had been issued about a month before the search.

After the search, Judge Thompson issued an arrest warrant for Claywell, based on the allegation that Claywell had violated the terms of his probation by possessing a firearm. At a violation hearing, Claywell testified that the gun belonged to his elderly father, who had kept it in the office safe for years. Claywell claimed to have forgotten about the gun for at least the time

during which he was a convicted felon. Claywell and his wife testified that the Mobil credit cards were, in fact, in a different drawer not hidden by the wooden door, and that nothing was stored in the drawer beneath the gun. Claywell also presented evidence that he had placed his gun collection into a storage container leased to his wife after his felony conviction.

Judge Thompson found that the Government had not proven by a preponderance of the evidence that Claywell had knowingly possessed the seized firearm.

### D.    Obstruction of Justice

In the plea agreement, the parties stipulated that the defendant's offense level should properly be increased by two levels pursuant to U.S.S.G. § 3C1.1 because he attempted to obstruct justice during the course of the investigation. *See* Plea Agreement at 4. The facts underlying such obstruction are not set forth in the stipulation of offense conduct, but are set forth below.

*Witness tampering.* The following information is based on interviews with cooperating witnesses Sara Taylor and Roger Bennett. After the commencement of the present criminal investigation, it became clear that federal authorities were focusing on the defendant's practice of paying personal expenses out of corporate funds, and then disguising those expenditures in the corporate ledger as job-related expenses. The handwriting on particular invoices directing that particular expenses be coded to this or that job, however, was not that of the defendant. He always directed someone else to do the coding, and left no paper trail identifying himself as the source of the decision to assign personal expenses to work-related categories. During a meeting between Claywell, Taylor, and Bennett, the defendant sought to further insulate himself from criminal liability. Claywell (together with Bennett) falsely suggested to Taylor that if anyone

22

inquired as to why personal expenses had been assigned to job-related categories, she could say

that she had decided to do so on her own; that she had naively (though mistakenly) assumed her

choice of account categories was correct; that she knew there was a "loan-to-officers" account;

and that she assumed the accountants would fix any errors by the time tax season arrived. All

present at the meeting knew that this suggestion was false. Claywell himself kept a tight control

over his finances, and personally instructed Taylor on a regular basis to assign job codes to his

personal expenses. In short, Claywell contrived a false defense to a tax conspiracy charge, and

tried to induce a witness to relay that false story to federal authorities.[2]

---

[2]Based on discussions with defense counsel, the Government understands that the
defendant does not materially dispute the above facts. For this reason, there is no need for the
Court to resolve any dispute with respect to the second basis for an obstruction enhancement
which is discussed in the PSR ¶32.

For the sake of completing the record, however, the Government clarifies that issue. At
the outset of the investigation, the Government issued a grand jury subpoena for all personnel
records of Claywell's corporations as well as other specified categories of documents. In
response, defense counsel provided numerous boxes of well-organized material that had been
thoroughly culled from the defendant's files. Included in this document production were what
appeared to be complete personnel files. What was perplexing to the Government, however, was
that these files contained no records relating to pension benefit checks issued to certain
employees. A number of former employees had indicated to the Government that such records
were kept in the personnel files, and that they reflected a portion of the defendant's illegal tax
scheme -- that is, they showed that he had withheld taxes from benefit checks (thus taking money
away from his employees), but failed to remit those withholdings to the IRS (thus taking money
away from his fellow taxpayers).

After Pamela Hill began cooperating with the government, she disclosed that some time
after the first grand jury subpoena (issued on November 5, 2001) had been served but before the
request was complied with, she discovered that the pension benefit records were no longer stored
as usual in the office's personnel files. Hill later learned from Kurt Claywell that those
documents were now located in a box in the basement. Upon inspection, Hill saw those
documents in manila folders in the basement, and those folders bore Claywell's handwriting. At
some point in early 2003, Hill learned that these records had been moved to the attic of Claywell
Electric. There was no indication that Claywell had ever alerted counsel that portions of the
personnel files had been segregated and stored in the basement or the attic. It was Claywell's

## IV.   **Discussion**

### A.   **The Loss to Traveler's Insurance on the Mail Fraud Counts**

In his sentencing memorandum, the defendant claims that he caused no "actual financial loss" to Traveler's Insurance. *See* Def. Sent. Memo at 9. This is based on his assertion that the amounts he stole from Traveler's are more than offset by amounts he chose not to bill them. The Government agrees that the Guidelines incorporate a set-off theory, under which the Court's loss calculations should be based on the net financial loss to the victim. Yet it is the defendant who bears the burden of proving set-off, and he has failed to provide such proof for the full extent of his claims.

As an initial matter, it should be noted that during its investigation, the Government's examination of seized financial records uncovered approximately $78,559 in medical expenses from January 1999 through October 2000 which could have been, but were not, claimed by the defendant under the Traveler's insurance policy. The defendant identified approximately the same amount for this same period as indicated in the chart below, and the Government therefore has no reason to challenge that such amounts are properly subject to set-off:

| | |
|---|---|
| Prepaid premium | $4,000.00 |
| McLean | $22,071.20 |
| VNA Valley Care, Inc. | $5,400.00 |
| Hebrew Home | $4,811.00 |
| Nurse Jackson | $1,250.00 |
| Nurse Brown | $14,650.00 |

removal and nondisclosure of these subpoenaed records which formed the second basis for the obstruction of justice enhancement.

24

| | |
|---|---|
| Nurse Rothchild | $5,000.00 |
| Nurse St. Martin | $18,310.00 |
| Nurse Lee | $500.00 |
| Nurse Rampassard | $1,340.00 |
| **SUBTOTAL** | **$77,332.20** |

Because the above figures were known the parties at the time of the plea agreement, such a setoff was already incorporated into the guidelines loss calculations. Moreover, through an exchange of correspondence in November 2003, the Government agreed that in light of additional unbilled amounts paid to McLean, the total net fraud loss to Traveler's was on the order of $42,853.00. *See* Attachment A hereto (Letter from USAO to defense counsel dated November 28, 2003).

The defendant offers two arguments why the remaining $42,853 of actual loss should be disregarded. Each is flawed. First, he claims an additional offset of $16,900 for unreimbursed nursing expenses which, he claims, were paid in 1997 and 1998. He provides absolutely no documentation in support of this factual assertion, whether in the form of receipts, invoices, or even cancelled checks. Given the defendant's illustrious history of falsifying claims, his unsupported (and unsworn) claims in this regard should be given absolutely no weight. Furthermore, the Government anticipated that the defendant might claim that he had unreimbursed expenses that considerably antedated the period of the offense conduct. The Government anticipated that such claims would be extraordinarily difficult to evaluate given the likely absence of records, and the impossibility of determining whether the defendant had obtained reimbursement for such expenditures from some other source. As a result of these concerns, the plea agreement contains an express limitation that only expenses incurred *after*

25

January 29, 1999, may be offset against the mail fraud loss figures. *See* Plea Agreement at 12

("The total amount fraudulently obtained from Travelers is $150,750, less any amount for which

the defendant could have properly sought reimbursement under the Travelers policy *for the

period beginning January 29, 1999*.").[3]

Second, the defendant claims that he declined to seek reimbursement for approximately

$45,000 under the Traveler's policy in 2002 and 2003. Yet he did so only *after* his crime was

detected. A thief cannot undo his crime simply by giving back the loot. That may reduce the

restitution he owes, but it does not reduce the actual loss suffered by the victim.

As far as restitution is concerned, the Government has no reason to dispute two offsets

listed by defense counsel in their letter of November 25, 2003, for which documentation has been

provided, namely (1) $4,000 for a prepaid premium which was never reimbursed to the

defendant; and (2) a $8,180.14 settlement death benefit which the defendant did not collect from

Traveler's. With all due respect, however, the defendant has offered nothing but an unsupported

estimate about amounts paid to nurses in 1997 and 1998; and no documents to support his claim

that his father was in fact at McLean Home from September 2002 through January 2003. While

that latter claim certain appears plausible, the Government has learned from hard experience that

Claywell's word alone is unreliable. For all the Government knows, the defendant's father may

not have been at McLean's for this period; or McLean's did not bill at $250 per day; or McLean's

---

[3]If the defendant had produced documentary evidence to support these claims, the Government might have considered waiving this provision of the plea agreement. Absent any such proof, however, the Government adheres to the bargained-for provisions of the agreement, which contractually eliminated the parties' need to engage in any complicated litigation over such difficult-to-verify expenses. The Government recognizes, of course, that the plea agreement's loss calculations are not binding upon the Court.

might have been reimbursed under some other insurance policy such as Medicare; or the bills

might never have been paid. Absent some documentary proof submitted prior to sentencing

establishing that Claywell incurred expenses of $36,750 that he did not bill to Traveler's -- or a

representation that counsel has personally verified the existence of such expenses -- the

Government respectfully submits that the defendant should receive an offset against restitution of

only $12,180.14, for a total restitution amount of $30,672.86 payable to Traveler's Insurance.

**B.      The Government Agrees that the Defendant's Provision of Information to State Authorities in Connection with the Rowland Impeachment Inquiry Authorizes This Court to Consider a Downward Departure Pursuant to U.S.S.G. § 5K2.0.**

Defense counsel properly reports in its memorandum that Mr. Claywell provided

information to federal authorities, but did not thereby provide substantial assistance in the

investigation or prosecution of any third party as required for the Government to file a motion

pursuant to U.S.S.G. § 5K1.1. The Government has nevertheless agreed that, based on the facts

of this case, the Court has discretion under U.S.S.G. § 5K2.0 to grant a downward departure in

light of the defendant's provision of information to state authorities in connection with their

Rowland inquiries. As defense counsel accurately reports, the defendant provided information

which was corroborated in certain material respects by documentary evidence, for example that

he had provided valuable gifts such as fine wine and boxes of Cuban cigars to former Governor

Rowland, in an effort to have the Governor intervene on Claywell's behalf in a dispute over

payments arising from a state contracting job.[4]

---

[4]Defense counsel has provided the Court with a news article dated March 18, 2004, in which Claywell's cooperation with state authorities was first announced, and quotes Representative John Wayne Fox as saying that "Kurt Claywell's testimony could break the logjam of potential witnesses, who have balked at providing documents or testifying in person

27

## C.    The Court Should Not Reduce the Defendant's Offense Level for Acceptance of Responsibility

The defendant has engaged in three courses of conduct which flatly contradict any claim that he has accepted responsibility for his wrongdoing. First, he has violated an essential term of his plea agreement by failing to file accurate amended tax returns by the time of sentencing. Second, he has engaged in continuing criminal activity by knowingly filing false certified payroll reports in connection with a federally funded project, in which he falsely claimed to have made pension contributions on behalf of certain employees. Third, as found by Judge Hall, he has

---

before the House Select Committee of Inquiry." Def. Sent. Mem., Att. A at 1. In the interests of completeness, so that the Court may consider the extent of any downward departure it might grant pursuant to § 5K2.0 in light of the ultimate utility of the defendant's cooperation, the Government notes that the Final Report of the Select Committee did not include any information regarding the defendant. *See* Final Report of the Select Committee of Inquiry Pursuant to House Resolution 702, dated June 28, 2004 (available at http://www.cga.ct.gov/inq/FinalReport.pdf). Moreover, during his prefatory remarks to the Select Committee on June 8, 2004, the Committee's Special Counsel Steven Reich's only references to the defendant were as follows:

One of the more difficult issues we faced involved allegations made by Kurt Claywell. We invested significant resources attempting to confirm Mr. Claywell's story and, in fact, we were able to confirm some aspects of what he said. Even after correspondence between Mr. Claywell and the Governor was made public by us, we obtained considerably more correspondence making clear that gifts, even beyond those we initially knew about, had been given.

And yet, Mr. Claywell gave us pause. He has a history of fraud offenses. And, most importantly, we could not confirm certain parts of his story that we deemed critical to our inquiry. Because of his background, I decided early-on that if we could not independently confirm all of the key elements of Mr. Claywell's story, we would not recommend that the Committee rely on his information.

Today, I stand by that decision. Because there are gaps in Mr. Claywell's story that we could not fill in, we will not present evidence at this hearing relating to his allegations.

An unpaginated transcript of his full remarks is available at the State of Connecticut's official website at http://www.cga.ct.gov/2004/INQdata/chr/2004INQ00608-R001230-CHR.htm.

violated his conditions of release.

### 1.     The Defendant Has Failed to File Accurate Amended Tax Returns

The defendant has demonstrated his complete failure to accept responsibility for his tax crimes, by failing to file correct amended tax returns as required by the plea agreement. He has done so in three respects. First, he has not yet filed any amended tax returns -- each of the returns in question has been prepared by his accountant, but none bears his own signature or has been filed with the Internal Revenue Service. The plea agreement requires more than simply submitting draft tax returns for the perusal of the undersigned Assistant United States Attorney, or the Probation Officer, or the Court. The agreement requires him to "to *file* amended [returns] . . . before the time of sentencing." Plea Agreement at 3 (emphasis added). If the defendant has not filed all required returns by the time of sentencing, this would provide a sufficient basis for the Court to deny him credit for acceptance of responsibility.

Second, he has not even prepared drafts of all the returns covered by his plea agreement. The agreement clearly states that he must file "personal income tax returns, as well as corporate income tax returns *and quarterly employment tax returns* for Claywell Electric Co., Inc., and Claywell Inc., for the tax years 1996 through 2000." To date, the Government has not seen any revised quarterly employment tax returns for the defendant's corporations. Absent his failure to do so, he has failed to comply with a central provision of the plea agreement.

Third, and most egregiously, the draft returns which he has submitted to the Court (through the Probation Office) and to the Government are materially false. Specifically, the defendant's personal income tax returns do not reflect any additional income for personal expenses paid out of corporate coffers. *See, e.g.,* Attachment B (Amended Form 1040X for year

1997, Line 1: reflecting net increase of only $10 in adjusted gross income); Attachment C

(Amended Form 1040X for year 1998, Line 1: reflecting net increase of only $24 in adjusted

gross income); Attachment D (Amended Form 1040X for year 1999, Line 1: reflecting net

increase of only $1,015 in adjusted gross income).  Any increased income reported for tax years

1996 through 2000 is attributable almost exclusively to disallowance of a "related party property

sale" in 1996 -- i.e., the sale of his home -- and to dividends received from the shell Inter-Island

corporation.  The personal expenses are now buried in the "loan to shareholder" ledger account

of Claywell Electric.  *See, e.g.,* Attachments G-K (excerpts from amended Forms 1120 corporate

income tax returns for Claywell Electric for 1996 through 2000, reflecting cumulative increase in

"loan to shareholders" from $31,888 in 1996 to $1,542,375 in 2005).[5]

One of the key charges in the tax conspiracy was that Claywell had caused these personal

expenses to be disguised in his corporate records as business-related expenses.  *See* Indictment at

¶10.  Moreover, one of the key points of the plea negotiations regarded the tax treatment of these

expenses.  The stipulation of offense conduct contained the following operative language, and

Claywell both signed that statement and affirmed it to be true under oath during his plea

colloquy:

> ***Personal expenses paid by corporate funds***.  From 1996 through 2000,
> the defendant knowingly and willfully paid hundreds of thousands of dollars of
> personal expenses out of corporate funds, without declaring these payments as
> personal income on his Forms 1040.  These personal expenses have included the
> costs of building two homes and renovating a vacation house; a speed boat, jet
> skis, and snowmobiles, and private school tuition.  A chart of such personal

---

[5]The defendant's amended corporate income tax returns reflect a much lower aggregate
tax liability than foreseen by the plea agreement.  Absent any backup documentation, the
Government is unable at this time to express any view about the accuracy of those amended
returns beyond the falsely increased "loan" accounts.

expenses paid out of corporate funds, which the defendant failed to report on his personal income tax returns, is appended as Attachment B. *Each of these personal expenses was reportable as personal income to the defendant in the year in which the expense was paid. The defendant agrees to report each of these personal expenses, as well as any other reportable income, on amended personal income tax returns for himself for the period from 1996 through 2000.*

The defendant directed his employees to alter his business records to disguise the personal nature of these expenses in a number of ways, including but not limited to (1) altering payee names on checks; (2) altering invoices; and (3) assigning job codes and general ledger categories to personal expenses on invoices, internal Check Requests, and in the corporations' computerized TACT accounting system. For example, in 1998, the defendant caused the purchase of a speed boat costing over $50,000 to be logged in the corporate records as expenses relating to generators at the Stamford Courthouse. In 2001, the defendant caused approximately $50,000 in expenses towards a personal party to be logged in the corporate records as various sorts of business expenses, including a check for $33,578.78 designated as expenses for the Connecticut Juvenile Training School, and a check for $10,000.00 designated as overhead expenses for employee conference with officials of the Department of Public Works.

The defendant was aware that a "loan to officers" account existed in his internal bookkeeping system, and in fact directed his employees to assign some personal expenses charged to corporate credit cards to that account on a monthly basis. He knowingly and willfully caused his employees to assign the vast majority of his personal expenses paid by the corporations to job codes and general ledger categories other than the "loan to officers" account, *because he did not intend to reimburse the corporation for those expenses.*

Plea Agreement at 9. The italicized language unambiguously sets forth the defendant's agreement to report each of the personal expenses listed on the schedule attached to the plea agreement as personal income on his amended tax returns. Because each of the amended returns submitted by the defendant does *not* report these personal expenses as personal income, he has violated the plain language of the plea agreement.

To be sure, the defendant's sentencing memorandum is carefully worded: It states that "the actual tax loss *according to Mr. Claywell's accountant*" is considerably less than set forth in

31

the plea agreement. Def. Sent. Mem. at 9 (emphasis added). Nowhere does the defendant himself stand behind his accountant's conclusions. Nor does he offer any explanation for how his accountant reached a conclusion that is so dramatically at odds with his own concession in the plea agreement. In response to requests for clarification by the Government, the defendant has simply replied that his accountants relied on (unspecified) tax rules and regulations.

Two points seem to be in order here. First, the plea agreement is clear -- the defendant's agreement to report these personal expenses on his personal income tax returns was nowhere conditioned upon the later concurrence of some third party, such as an accountant. The defendant had ample opportunity to seek legal and accounting advice before entering into the plea agreement, and the fact that he may now be receiving different advice about the viability of his "loan" theory does not entitle him to renege on his plea agreement.

Second, to the extent that the defendant's present accountants are suggesting that personal expenses paid out of corporate funds may be retroactively regarded as loans to the defendant, they are simply incorrect. Such a claim is necessarily founded on the inaccurate factual premise that the defendant intended to later repay his corporations for those expenses. *See generally Tollefsen v. C. I. R.*, 431 F.2d 511, 513 (2d Cir. 1970) ("The controlling question [in determining whether a shareholder's withdrawal of funds from a closely held corporation constitutes a loan as opposed to taxable income] is whether there was an intent to make a loan, i.e., whether repayment was in fact contemplated by the parties."); *Bergersen v. C.I.R.*, 109 F.3d 56, 60 (1st Cir. 1997) ("An effective permanent transfer of corporate funds to an owner is the hallmark of a dividend or a salary, and not a loan. There is nothing wrong with an owner making such a transfer. But when made to a U.S. mainland resident, the transfer is subject to U.S. income

32

tax.").[6]  In his stipulation of offense conduct, the defendant affirmed under oath (a) that he never intended that these expenses be logged to an officer's loan account, and indeed disguised them as corporate expenses instead, and (b) that he never intended to reimburse the company for these expenses (i.e., that he never intended that they constitute loans).

Moreover, the evidence amassed by the Government compels that same conclusion. The defendant was well aware of the fact that his bookkeepers maintained a loan account on the corporate books which was occasionally paid down. We know he was aware of the loan account because he instructed Taylor, on a monthly basis, to assign particular charges on his credit card bills to it. Despite this awareness, the defendant nevertheless directed Taylor and others to regularly log the vast majority of his personal expenses *not to his loan account* but rather to job-related categories. The defendant never informed the accountants who had prepared his original tax returns that he had buried personal expenses in his job-related accounts. Moreover, the defendant's efforts to obstruct justice through Sara Taylor by planting the story that she had independently and erroneously assigned his personal expenses to job categories rather than his loan account, described *supra*, only reinforces the conclusion that the "loan" story was and is nothing more than a cover for his tax evasion scheme.

---

[6]"A distribution made by a corporation to a shareholder with respect to its stock is a dividend, and so includable in gross income, if it is made out of current or accumulated earnings and profits." *Tollefsen*, 431 F.2d at 513; *see also United States v. D'Agostino*, 145 F.3d 69, 72 (2d Cir. 1998) (holding that diverted corporate proceeds are taxable as constructive dividend only if company had earnings and profits). In the present case, the defendant's own amended tax returns indicate that as of December 2000, his corporation had retained earnings of $3,541,999 -- far in excess of the over $1 million in personal expenses cumulatively paid out of corporate funds. *See* Amended Form 1120, page 4, line 25.

**2.    The Defendant Has Engaged in Additional Criminal Activity While on Release Pending Sentencing.**

Shortly before the July 2005 hearing scheduled before Judge Hall, the Government learned that the defendant was the subject of a civil audit by the Wage and Hour Division of the U.S. Department of Labor. Specifically, the Department was investigating allegations that the defendant had failed to provide mandated fringe benefits to a number of electricians who were employed pursuant to a federally funded contract at the submarine base in Groton, Connecticut.

By way of background: Contractors are often required as a condition of working on publicly funded projects to pay their employees a "prevailing wage" established by the federal or state Department of Labor. Such a "prevailing wage" generally includes a base wage to be paid to the employees in cash, plus a certain dollar amount that must be provided as fringe benefits -- whether in the form of contributions to a qualified plan (for example, for health insurance or a pension) or in cash. As a condition of holding a publicly financed contract, a contractor must file periodic "certified payroll reports" which list the hours worked by particular employees, and the rate paid to each, including amounts paid in various forms of fringe benefits.

In the present case, the defendant was selected as the electrical subcontractor on a job at the submarine base in Groton for work to be performed in 2004. As a requirement of that contract, he was obliged to pay his employees a set prevailing wage established by the U.S. Department of Labor: $29.15 per hour as a base wage, and $12.19 per hour as fringe benefits. Furthermore, the defendant filed, or caused to be filed, weekly certified payroll reports to the prime contractor on the job, listing the amounts paid to each employee. These reports specified the dollar amounts paid to each employee in cash in a column labelled "BASE HOURLY

34

RATE." *See* Attachment L (certified payroll reports). The reports also specified the portions

paid as fringe benefits to each employee, in a column headed "TYPE OF FRINGE BENEFITS."

*Id.* For each employee, this latter column was broken into lines numbered 1 through 6, with each

number corresponding to a form of fringe benefits paid to the employee:

> 1) Medical or hospital care
> 2) Pension or retirement
> 3) Life Insurance
> 4) Disability
> 5) Vacation, Holiday
> 6) Other (please specify)     Sick Time

In the brief amount of time the Government has had to research this matter, it has

obtained records from Manulife and Beneco Systems, with which the defendant maintains

pension plans for some of his employees. Based on a review of these records, the Government

has learned that defendant has *never even opened a pension account* (much less made pension

contributions) for at least three electricians -- Salvatore DiPalma, Brandt Nelson, and David Tine

-- for whom the defendant claimed on the certified payroll forms to have made pension

contributions. A representative sample of these false payroll forms, for work weeks in July

through September 2004, are appended hereto as Attachment L. The Court will note that each of

these certified payroll forms bears the defendant's signature (either in original form, or perhaps

with a signature stamp) beneath the following jurat:

> The Employer is aware that filing a certified payroll which he knows to be false is
> a class D Felony [under Connecticut law] for which the employer may be fined up
> to five thousand dollars, imprisoned for up to five years or both.

Moreover, because this statement was required as a condition of a federally funded contract, his

statement falls within the jurisdiction of the U.S. Department of Labor (as evidenced by the

35

ongoing civil audit of the Wage and Hour Division). According, his false statements violate 18 U.S.C. § 1001. In short, the defendant cheated his electricians out of hard-earned benefits, and then lied about it under oath. Repeated prosecutions have not diminished his complete disdain for the truth. For this reason alone, the defendant should be denied credit for acceptance of responsibility.

## C.     The Defendant Violated His Conditions of Release

As Judge Hall found at a hearing in open court on June 13, 2005, the defendant repeatedly violated the conditions of release by failing to notify the Probation Office of his multiple contacts with police in Simsbury, in connection with his sexual assault of an employee (which eventually led to his arrest on pending state charges), a domestic disturbance at his home, and a traffic violation. The plea agreement specifically provides that the Government may choose not to recommend that the defendant receive credit for acceptance of responsibility if he engages in any acts which "constitute a violation of any condition of release." Plea Agreement at 3. Viewed in conjunction with Claywell's violation of his plea agreement, and his continuing criminal conduct set forth above, his violations of release conditions also militate in favor a finding that he has not accepted responsibility for his offense.

36

## V.    Conclusion

> "After my second arrest, I tried to clean up my life . . . . I am truly sorry for who I was and how I acted over the years in question and am attempting as best I can to become a better person."[7]

Kurt Claywell's meek insistence that he has "tried to clean up" his life is insincere. One does not "clean up" one's life by cheating employees of their fairly earned wages, and then lying under oath week after week about it. One does not "clean up" one's life by submitting false tax returns to the Court in anticipation of sentencing, completely denying the core of one's criminal activity. One does not "clean up" one's life by violating court-ordered terms of release. Nor does one "clean up" one's life by submitting fraudulently altered documents to a bank in order to obtain a $468,750 loan.

It has been nearly five years since Kurt Claywell last stood before this Court for sentencing in a criminal case. Given his lack of criminal history, he was sentenced to a term of probation. Claywell took advantage of his freedom to engage in a never-ending parade of tax and fraud schemes. His actions have demonstrated a total disregard for his fellow taxpayers, his employees, other businesses, and for the law itself. The Government respectfully requests that the Court deny the defendant acceptance of responsibility, and set his offense level at 28, yielding a guideline sentencing range of 87-108 months. To the extent that the Court deems it appropriate

---

[7]Letter to the Court from Kurt Claywell dated July 6, 2005, appended to Third Addendum to PSR.

to depart downward pursuant to § 5K2.0, the Government respectfully submits that any such departure be from that higher guideline range.

Respectfully submitted,

JOHN H. DURHAM
DEPUTY UNITED STATES ATTORNEY

EDWARD KANG
ASSISTANT U.S. ATTORNEY
Federal Bar No. CT26653

for: WILLIAM J. NARDINI
ASSISTANT U.S. ATTORNEY
Federal Bar No. CT16012
157 Church Street, 23rd Floor
New Haven, CT  06510
Tel.: (203) 821-3748
Fax: (203) 773-5377
william.nardini@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August 2005, a true and correct copy of the foregoing Motion was served via first-class mail, postage prepaid, upon defense counsel:

Stanley A. Twardy, Esq.          M. Hatcher Norris, Esq.
Day Berry & Howard LLP          Butler Norris & Gold
One Canterbury Green            254 Prospect Ave.
Stamford, CT 06901             Hartford, CT 06101-2041

EDWARD KANG for WILLIAM J. NARDINI
Assistant U.S. Attorneys

38